### IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RONNA VINSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. CIV-20-720-R |
| | ) |
| STANDARD LIFE AND CASUALTY | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

### ORDER

Plaintiff filed this action alleging breach of contract and bad faith by Defendant Standard Life and Casualty Insurance Company ("Standard") as well as a claim for false representation, concealment and deceit with regard to a policy of insurance issued but rescinded by Standard insuring the life of her husband, Johnnie Vinson. (Doc. No. 1-1). Defendant filed a motion for summary judgment seeking summary judgment on all claims as well as on Plaintiff's request for punitive damages. (Doc. No. 29). Plaintiff responded in opposition to the motion. (Doc. No. 44). Upon consideration of the parties' submissions the Court finds as follows.

Summary judgment is properly granted if the movant shows that no genuine dispute as to any material fact exists and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it affects the disposition of the substantive claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 247, 248 (1986). The party seeking summary judgment bears the initial burden of demonstrating the basis for its motion and of identifying those portions of "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any," that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). If the movant satisfactorily demonstrates an absence of genuine issue of material fact with respect to a dispositive issue for which the non-moving party will bear the burden of proof at trial, the non-movant must then "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. When considering a motion for summary judgment, a court must "'view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.'" *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000) (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999), *abrogated on other grounds by Eisenhour v. Weber Cnty*, 739 F.3d 496 (10th Cir. 2013)).

This case arises from the issuance and subsequent recission of a life insurance policy to Plaintiff's spouse, Johnnie Vinson. On February 12, 2019, Mr. Vinson applied for replacement life insurance with Defendant Standard; the policy did not require that he undergo a physical. The guaranteed issue policy had a face value of $10,000. Mr. Vinson died on June 20, 2019, and Plaintiff, as beneficiary, filed a claim with Standard.[1] On October 10, 2019, Standard sent a letter to Plaintiff denying the claim and refunding the premium, indicating the policy was being rescinded because "Mr. Vinson made one or more material misrepresentation(s) in the application for insurance." (Doc. No. 29-3, p. 2).

---

[1] Mr. Vinson's cause of death was listed on the State of Florida Certification of Death as "oxycodone and morphine toxicity." (Doc. No. 29-2, p. 2). "Other significant conditions contributing to death but not resulting in the underlying cause" were "coronary atherosclerosis, dilated cardiomyopathy, hypertension, and obesity." (Doc. No. 29-2), p. 3.

Plaintiff contends that by failing to pay the claim Standard breached the contract and further that its conduct, specifically the investigation in support of rescission, was undertaken in bad faith. Finally, Plaintiff contends that Defendant, through its agent, committed fraud with regard to issuance of the policy. Defendant contends it did not breach the contract because it was entitled to rescind the policy in light of certain misrepresentations by Mr. Vinson in his application. Defendant further argues it is entitled to summary judgment on Plaintiff's bad faith and fraud claims.

The medical records submitted by the parties set forth Johnnie Vinson's medical history, or a large portion thereof, from January 7, 2015 until January 15, 2019, the month before he applied for the policy with Standard. On January 7, 2015, Dr. Rasul treated Mr. Vinson for high blood pressure, and prescribed losartan and carvedilol. (Doc. No. 44-29). These two prescriptions were continued for Mr. Vinson's next two visits with Dr. Rasul, each noting that he was suffering from high blood pressure. (Doc. No. 44-30, 44-31). On November 11, 2015, Dr. Rasul concluded that Mr. Vinson was suffering from high blood pressure but added a diagnosis of congestive heart failure. (Doc. No. 29-7). Notably, this is the only medical record that indicates a diagnosis of congestive heart failure; the phrase does not appear in any of Mr. Vinson's prior or subsequent medical records. Mr. Vinson returned to Dr. Rasul on December 10, 2015 and this record includes high blood pressure in his medical history list. He was prescribed losaratan and carvedilol. (Doc. No. 44-32).

On April 29, 2016, Mr. Vinson saw Dr. Rigdon for purposes of establishing care. Dr. Ridgon noted his high blood pressure and told him to continue his carvedilol. (Doc. No. 44-3). Mr. Vinson next saw Dr. Rigdon on May 17, 2016, who noted his high blood

3

pressure and told him to continue carvedilol (Doc. No. 44-11). The "current medications" list includes losartan. *Id.* On June 28, 2016, Mr. Vinson presented to Dr. Rigdon for various issues, including his high blood pressure. His medical list remained the same with regard to the two blood pressure medications. (Doc. No. 44-12). The next appointment with Dr. Rigdon was to address various issues, including Mr. Vinson's elevated blood pressure. (Doc. No. 44-13). Although not referenced in that treatment record it appears that Mr. Vinson continued with the carvedilol and the losartan, because when he returned on September 30, 2016, both of those medications appear on his "Current Medications" list. (Doc. No. 44-14). Dr. Rigdon instructed him to "[c]ontinue blood pressure medication." (Id. at 2). Mr. Vinson saw Dr. Rigdon for issues unrelated to his hypertension on November 8, 2016; both blood pressure medications as listed as "current." (Doc. No. 44-15). On November 20, 2016, Dr. Rigdon addressed a number of issues with Mr. Vinson, including his blood pressure and instructed him to continue his medications. (Doc. No. 44-16). Johnnie Vinson's treatment with Dr. Rigdon continued from December 2016 through December 2018. Treatment notes from visits over the course of the next two years indicate that Mr. Vinson's high blood pressure was routinely addressed and both carvedilol and losartan are listed as "current medications" throughout that time period.

Mr. Vinson apparently initiated treatment at Parrish Medical Center on December 20, 2018. The treatment notes indicate that the doctor and patient "reviewed problems", including essential hypertension. Dr. Modi from Parrish Medical saw Plaintiff again on January 15, 2019, the last doctor's appointment before Mr. Vinson's application for purposes of the summary judgment record. According to a letter sent to Mr. Vinson with

4

the summary of that visit, his "current medications" included carvedilol and losartan and they discussed his primary hypertension. The record also notes a "finding of Hepatitis C status." (Doc. No. 29-10).

On February 12, 2019, Johnnie Vinson applied for the $10,000 life insurance policy at issue here. He signed an application completed by Faith Johnson, a self-described "field underwriter." According to Plaintiff and not disputed by Standard, Ms. Johnson recorded Mr. Vinson's answers on the application form which he then signed, indicating he had read or had read to him all the statements and answers therein and that the answers were "true and complete to the best of" his "knowledge and belief." (Doc. No. 29-1 p. 4). Mr. Vinson answered "no" to all of the questions regarding relevant health conditions. Defendant focuses on Mr. Vinson's answer to three questions: numbers three, four and six. Question three asked whether the proposed insured had ever been diagnosed with hepatitis C. (Doc. No. 29-1, p. 2). Question four queried whether the proposed insured, "**within the past 12 months**: . . . had diagnostic testing or hospitalization recommended by a medical professional which has not been completed or for which results have not been received?". *Id.* at 3 (emphasis in original). Question six asked whether, "[i]n the past 24 months, . . . the proposed insured: . . had diagnosis or treatment for: . . . coronary artery disease or any heart or circulatory disorder …?" (Doc. No. 29-3)(emphasis in original).   After completion of the application, Mr. Vinson's answers were subject to telephone verification by a third party and he provided answers consistent with those on his written application. (Doc. No. 29-5). Defendant Standard issued the whole life policy effective March 5, 2019. (Doc. No. 29-6, p. 2).

As noted, following Mr. Vinson's June 20, 2019 death his widow submitted a claim to Standard, which was denied by letter dated October 10, 2019. The letter noted Mr. Vinson's "no" answer to question six and stated:

> Medical records from Dr. Faiaz M. Rasul, MD of Space Coast Internal Medicine reveal the following: 11/11/15: "Echocardiogram: Left Ventricle wall motion: Basal inferoseptal hypokinesis; Assessments: 1. **Chronic diastolic congestive heart failure (Primary).** 3. Nonrheumatic pulmonary valve insufficiency. 4. Nonrheumatic tricuspid valve insufficiency. 5. Nonrheumatic mitral valve insufficiency. **Treatment: 1: Chronic diastolic congestive heart f**ailure: **Continue with Beta Blocker**". The **Beta Blocker** used to treat Mr. Vinson's **congestive heart failure** was **Carvedilol,** which was prescribed by Dr. Rasul until 04/29/16, when Mr. Vinson began treatment with Dr. Randall B. Rigdon, whose records reveal the following: 04/29/16, 05/17/16, 06/28/16, 09/08/16, 09/30/16, 11/08/16, 11/30/16, 12/20/16, 01/31/17, 05/17/17, 07/14/17, 10/09/17, 02/21/18, 02/27/18, 03/20/18, 04/16/18, 07/10/18, 08/07/18, 10/04/18, 11/15/18" **"Current medications: Carvedilol** 6.25 mg tablet: 1 tab, 2 times a day".

(Doc. No. 29-3) (emphasis in original). The writer concluded that Mr. Vinson made one or more material misrepresentations, and had he answered correctly, Defendant would not have issued the policy. Standard refunded the premiums paid and purported to rescind the contract. This letter was the only written communication submitted by the parties regarding denial of Plaintiff's claim.

Although the recission letter identifies a single alleged misrepresentation, at deposition Defendant's corporate representative, Kristen Pearcy, who served as the claims adjuster, gave additional examples of alleged misrepresentations that she believes support recission. She testified that had Mr. Vinson disclosed he was taking carvedilol Standard would not have written the policy because carvedilol is a "red flag" drug. (Doc. No. 29-

6

13, p. 3).[2]

Defendant further contends that although Mr. Vinson indicated he had never been diagnosed with hepatitis C, his medical records from January 15, 2019, indicate he tested positive for hepatitis C antibodies. (Doc. No. 29-10, p. 5)("Finding of Hepatitis C Status Active 01/15/2019").[3] Dr. Modi did not recall discussing the information with Mr. Vinson; however, his normal practice was to discuss lab results with patients. (Doc. 29-11, pp. 4-5, 8). Plaintiff argues that the presence of the hepatitis C antibody is not tantamount to diagnosis with hepatitis C, and therefore Mr. Vinson's answer was not false.[4]

Defendant also relies on Plaintiff's answer to Question 4, set forth above, arguing that rescission was appropriate because Plaintiff's treating physician, Dr. Rigdon, indicated on August 7, 2018 that he should be seen at the Mayo Clinic for purposes of diagnosis and treatment of possible Morgellons disease. Plaintiff counters by noting that a visit to the emergency department on August 6, 2018, resulted in a diagnosis of Morgellons disease and therefore his answer to Question No. 4 was not false or misleading. (Doc. No. 44-7, p. 6).

---

[2] In his written application Mr. Vinson identified that he was taking losartan, 100 mg per day, which is a non-beta blocker used to treat high blood pressure. (Doc. No. 29-1). The medical records support this representation. In his oral interview Mr. Vinson did not indicate he was taking losartan, but identified that he was taking valsartan, another non-beta blocker used to treat high blood pressure. (Doc. No. 29-5). There is no medical evidence of record that Mr. Vinson was prescribed valsartan.

[3] The treatment record from that day includes a section entitled "Assessment and Plan" stating, "[t]he following list includes any diagnoses that were discussed at your visit" and hepatitis C is not on the list. (Doc. No. 29-10, p. 3). Dixit Modi, M.D., Mr. Vinson's treating physician for that visit, testified that Mr. Vinson was antibody positive, "[s]o he either had past exposure or had active Hepatitis C. You cannot make out of it, . . . ." *Id.* at p. 4. He later testified, however, that Mr. Vinson did not have active hepatitis C virus. *Id.* at pp. 5, 9.

[4] In her deposition Plaintiff conceded that if Mr. Vinson was aware of his hepatitis C diagnosis when he completed the application in February 2019, he should have responded "yes" to question 3. (Doc. No. 44-6, p. 113).

7

"Under Oklahoma Stat. tit 36 § 3609 (1990), an insurer properly may rescind an insurance policy when the application contains a misrepresentation that (1) is fraudulent; (2) is material to the insurance company's acceptance of the risk; or (3) induced the insurer to issue the policy where it would not have done so had it known the true facts." *Vining on Behalf of Vining v. Enter. Fin. Grp., Inc.,* 148 F.3d 1206, 1215 (10th Cir. 1998).[5] Intent to deceive is a necessary element of the recission defense.[6] *Id.* "[T]he insurer bears the burden of proof to show not only that the statements were untrue, but also that the misrepresentations were either fraudulent, material to the risks or hazards assumed by the insurer, and, in good faith, the insurer would not have issued the policy, or covered the hazard if the true facts had been known in the application." *Claborn v. Washington National Ins. Co.,* 910 P.2d 1046, 1049 (Okla. 1996). The insurer must prove intent to deceive by clear and convincing evidence. *Scottsdale Ins. Co. v. Tolliver*, 261 F. App'x 153, 162 (10th Cir. Mar. 11, 2008). Furthermore,

> Whether a life insurance policy would have been issued had true answers been given in the application cannot be left to the determination of the insurer after the death of the insured. The matter is not to be settled by the mere pronouncement of the company after the death has occurred, but the matter misrepresented must be of the character which the court could say would reasonably affect the insurer's judgment as to the matter of the risk and the amount of the premium.

---

[5] On September 29, 2021, the Court conducted a conference call with counsel regarding their reliance on Oklahoma law in the briefs on summary judgment when the Policy was issued in Florida and the decedent applied for and answered the questions related to his application in Florida. *See* Okla. Stat. tit. 15 § 162 (indicating that a contract is to be interpreted according to the law and usage of the place of performance, and if such place is not specified, it should be interpreted pursuant to the law and usage of the place where it was made). The parties agreed to application of Oklahoma law. Although Defendant subsequently sought to file supplemental briefs addressing Florida law for Plaintiff's breach of contract and fraud claims, the Court denied its request, concluding that Defendant had waived its opportunity to raise the issue.

[6] Because the Policy was issued less than two years before Mr. Vinson's death, the two-year contestability period had not expired; therefore, Defendant could investigate the possibility of rescission without running afoul of Okla. Stat. tit. 36 § 4004.

*Claborn*, 910 P.2d at 1050 (citing 29 Am. Jur. *Insurance*, § 701).

The Court finds that Defendant has failed to establish it is entitled to summary judgment on Plaintiff's breach of contract claim. "Where the evidence is conflicting as to either insured's state of health at the time of the application, or the falsity of the insured's statements in the application process, or the intent of the insured, the issues are properly tendered to the jury for resolution." *Claborn.*, 910 P.2d at 1049 (citing *Brunson v. Mid-Western Life Ins. Co.*, 547 P.2d 970 (Okla. 1976) and *Atlas Life Ins. Co. v. Eastman*, 320 P.2d 397 (Okla. 1957)). The Court finds that there are material factual disputes with regard to Mr. Vinson's knowledge at the time he executed the application and affirmed his answers via telephone regarding his knowledge about the status of his health.

With regard to Question 6, which inquired whether Mr. Vinson had a diagnosis of or treatment for coronary artery disease or any heart or circulatory disorder, Ronna Vinson testified that she attended doctors' appointments with her husband and no doctor ever informed the couple that Johnnie Vinson suffered from congestive heart failure. The record reflects that Mr. Vinson was prescribed carvedilol, a beta blocker, to treat hypertension and congestive heart failure no later than 2015, and the records indicate the drug was originally prescribed to treat Mr. Vinson's high blood pressure. The record further shows that he continued on that medication through at least 2018. Competing with this evidence is the absence of any reference to congestive heart failure in the relevant medical records other than the record from November 11, 2015. Dr. Modi—who initiated care of Mr. Vinson in December 2018—testified that he believed the reason Plaintiff was taking carvedilol was for his blood pressure. (Doc. No. 44-2, p. 9). Kristen Piercey testified that only uncontrolled

9

blood pressure precludes issuance of a life insurance policy by Standard and did not indicate that Standard's recission relied in any manner on Mr. Vinson's hypertension. Accordingly, if Mrs. Vinson's testimony is believed and Mr. Vinson was never informed by Dr. Rasul of alleged congestive heart failure, believing he had only high blood pressure, his failure to check "yes" in response to question six would not have been intentional as it relates to congestive heart failure. And because Ms. Piercey's testimony on behalf of Defendant does not establish that high blood pressure, a circulatory disorder, would have precluded coverage, Defendant is not entitled to summary judgment on this basis either.

As to the exclusion of carvedilol on the written application and from the oral responses, Defendant has not met its burden of establishing the absence of any genuine issue of material fact. It is clear that Mr. Vinson was prescribed carvedilol for at least four years before he submitted his application. Furthermore, it is unclear why he would not have included the drug on either the written application or in response to the questions posed during the verification interview. This is especially odd given Mrs. Vinson's testimony that she gathered his pill bottles for purposes of answering the questions posed during the interview and that she never missed a doctor's appointment and therefore presumably was well aware of all of Mr. Vinson's prescriptions. However, there is no indication that the failure to list the drug was done with an intent to deceive given that it appears the drug was first prescribed for high blood pressure, the application and interview both identified other drugs used to treat high blood pressure, and there is no evidence that Mr. Vinson was aware of the significance of carvedilol to the application process from Standard's perspective. Accordingly, the Court finds that with regard to question six, Defendant has not established

by clear and convincing evidence that it was entitled to rescind the 2019 policy.

With regard to Mr. Vinson's answer to question three, relating to diagnosis of hepatitis C, the Court finds a genuine issue of material fact regarding Mr. Vinson's knowledge and intent. The Application asked whether the proposed insured had ever been diagnosed with hepatitis C. The clinical records submitted by the parties show a "finding of Hepatitis C Status" on a January 15, 2019, record in a section entitled "problems." The section of the medical record entitled "Assessment and Plan" from that date does not reference Mr. Vinson's hepatitis C status. Dr. Modi testified that although he did not recall his conversation with Johnnie Vinson on that date, his standard practice would have been to discuss the test results, which indicated the presence of hepatitis C antibodies.[7] What is not apparent, however, is whether Dr. Modi believed he was diagnosing Johnnie Vinson with hepatitis C or whether a finding of positive antibodies is tantamount to a diagnosis of hepatitis C and whether the conversation with Dr. Modi alerted Johnnie Vinson to this fact.[8] Dr. Modi testified that screening for hepatitis C would have been routine because of Mr. Vinson's age, not because he was experiencing symptoms of the disease. (Doc. No. 44-2, p. 5).

---

[7] Dr. Modi was asked in deposition:
    Q:    [S]o if Johnnie Vinson were asked if he had ever had Hepatitis C and he said no that would be an untruthful statement, wouldn't it?
    A:    Yes.
(Doc. No. 29-11, p. 12). However, the application did not ask Mr. Vinson whether he had ever had Hepatitis C, but rather inquired whether he had been diagnosed with Hepatitis C, which to the Court is a more nuanced question in the context of Hepatitis C.

[8] From the evidence presented it appears that Mr. Vinson returned to Dr. Modi in March 2019, after he completed his application with Standard, and at that time was informed that he did not have active hepatitis C. Although there is reference to a March 10, 2019 appointment in Dr. Modi's deposition, neither party provided the Court with this record.

11

Finally, with regard to question 4, Defendant has failed to establish as a matter of law that Johnnie Vinson's answer was false and Defendant has not presented evidence that compels the Court to conclude that misrepresenting this particular matter, which related to a potential psychiatric diagnosis, was of a character that would have reasonably affected Standard's judgment as to the matter of the risk and the amount of the premium. None of the inquiries on the Application related specifically to mental health. Further, as noted by Plaintiff, on August 6, 2018, Mr. Vinson was assessed in the emergency department of Health First Cape Canaveral Hospital which resulted in a "clinical impression" of Morgellons disease. (Doc. No. 44-10). Although his treating physician saw him for a follow up the next day and recommended that he visit the Mayo Clinic, for "further evaluation," no specific diagnostic testing or hospitalization is set forth in the record that had not yet been completed. (Doc. No. 44+-27). The evidence upon which Defendant relies does not establish as a matter of law, by clear and convincing evidence, that Mr. Vinson's response to question 4 was false, and with the intent to deceive such that it supports Defendant's recission decision.

At the summary judgment stage, the Court must construe the evidence and the inferences in the light most favorable to the Plaintiff. For the reasons set forth above, in light of Oklahoma law and the requirement that Defendant prove by clear and convincing evidence that Mr. Vinson's application contained a material misstatement to support its recission of the policy, the Court finds that summary judgment is inappropriate on Plaintiff's breach of contract claim.

Defendant also seeks summary judgment on Plaintiff's bad faith claim. Under Oklahoma law, "an insurer has an implied duty to deal fairly and act in good faith with its insured and [a] violation of this duty gives rise to an action in tort for which consequential and, in a proper case, punitive, damages may be sought." *Christian v. Am. Home Assurance Co.*, 577 P.2d 899, 904 (Okla. 1977). In its Motion for Summary Judgment Defendant relies solely on its argument that the Policy did not provide coverage and therefore Plaintiff cannot establish a bad faith claim. (Doc. No. 29, pp. 19-22). Having concluded that Defendant is not entitled to summary judgment on Plaintiff's breach of contract claim, the Court lacks a basis from Defendant's motion for granting summary judgment on Plaintiff's bad faith claim.

Additionally, the existence of a legitimate dispute does not, by itself, resolve a bad faith claim. Rather, "it shifts the burden to the insured to present additional evidence of bad faith." *Sims v. Great Am. Life Ins. Co.,* 469 F.3d 870, 891 (10th Cir.2006) (applying Oklahoma law). "Most commonly, the insured asserts an insurer's failure to conduct an investigation reasonably appropriate under the circumstances." *Id.* This is exactly what Mrs. Vinson claims here.

Furthermore, the Court finds genuine issue of material fact with regard to Plaintiff's bad faith claim. The evidence presented indicates that when Kristen Piercey considered Plaintiff's claim, as soon as she discovered the 2015 record of congestive heart failure and continued prescription for carvedilol for years afterward, she concluded he must have intended to deceive the company when he answered "no" to question six and failed to list carvedilol on his medication page. She apparently did not consider the absence of any

mention of congestive heart failure in any of the prior or subsequent treatment records, even though she had access to those records because she was able to note he continued to be treated with carvedilol. She did not reach out to Dr. Modi or Dr. Rigdon, both of whom treated Mr. Vinson shortly before his application, to assess what information either had conveyed to Mr. Vinson regarding his medical condition. Communication with Dr. Modi would have revealed that he had not diagnosed Mr. Vinson with congestive heart failure and his belief that the insured's use of carvedilol was for high blood pressure. Mrs. Vinson testified that Mr. Vinson was never told he had congestive heart failure, and had Defendant reached out to Plaintiff and requested more information, that information could have been part of Defendant's recission decision. To avoid summary judgment Plaintiff must present evidence that (1) the manner of Defendant's investigation hints at a sham defense or otherwise suggests that material facts were overlooked, or (2) that Defendant intentionally disregarded undisputed facts supporting the insured's claim. *Id.; see also Oulds v. Principal Mut. Life Ins. Co.,* 6 F.3d 1431, 1442 (10th Cir. 1993) (applying Oklahoma law). Because Standard relies solely on the validity of its recission as a basis for summary judgment, its motion is denied with regard to Plaintiff's bad faith claim.

Defendant also seeks summary judgment on Plaintiff's fraud claim. The contours of Plaintiff's fraud claim are not entirely clear to the Court, although it is premised on alleged misrepresentations of Faith Johnson on the Standard application. Plaintiff argues, in part:

> Mrs. Vinson discussed with the agent during the application that Mr. Vinson had been in the hospital to get a laparoscopy to check his heart. *See* paragraph 29 above. Mrs. Vinson stated that she was talking about the November 11, 2015 timeframe with Dr. Rasul which was more than two (2) years prior and

14

> what Dr. Rasul told them was that Mr. Vinson had high blood pressure. *See* Vinson depo, Ex. 6, pp. 135-36. . . .
>
> . . . . The undisputed testimony is that Mrs. Vinson brought the heart test to the attention of the agent, and the agent sold her the policy anyway and told her to cancel her existing life insurance policy with Lincoln Heritage. Mrs. Vinson had specifically discussed as much as she knew about this 2015 medical procedure with Defendant's agent. . . . The agent's decision not to put this on the application, whether it was due to an intent on the part of the agent to conceal information or because the agent felt the information was irrelevant because it was more than two (2) ears old, is grounds for fraud and/or deceit against the insurance company. In order to sell the insurance, the agent made a representation that Mr. Vinson would be covered or concealed information that he would not be covered under the Standard Policy, so he could cancel the Lincoln Heritage policy.

Doc. No. 44, pp. 29-30.[9]

Fraud, deceit, and constructive fraud "require detrimental reliance by the person complaining." *Howell v. Texaco Inc.*, 112 P.3d 1154, 1161 (Okla. 2004). Plaintiff presents no evidence that Mrs. Vinson relied to her detriment on any statement allegedly made by Ms. Johnson to her, or on any omission of information that Ms. Johnson was obligated to reveal. Although Mrs. Vinson testified that she spoke about her husband's 2015 procedure that resulted in him being put on blood pressure medication, there is no indication that Ms. Johnson heard the comment. The comment does not appear on the transcript of the telephonic verification. Plaintiff does not provide any evidence from Ms. Johnson to

---

[9] At her deposition Mrs. Vinson was asked the following by defense counsel:
> One of the documents that we have subpoenaed in this case that I've produced to your lawyer today is the final policy of Lincoln Heritage Life Insurance Company, the company that paid eventually after you realized they were trying to get in touch with you, the $10,000 life claim. There was a prior application submitted by Faith Jonson and signed purportedly on your husband's behalf on March -- May 7, 2015. Were you involved in that application and the time it was collected and submitted?

Thus, it appears that the Lincoln Heritage policy was not cancelled, and Plaintiff cannot rely on the alleged cancellation as a basis for her fraud/deceit claim.

15

substantiate her claim that the agent heard her comment and ignored it. There is no evidence Ms. Johnson assured Mr. Vinson that the policy would be issued to him or that she made assurances to Mrs. Vinson to that effect. Furthermore, if Ms. Johnson had included the information allegedly provided by Mrs. Vinson the policy would not have been issued, leaving Plaintiff in no better position than she finds herself now. In short, the evidence presented by Plaintiff fails to meet the clear and convincing standard of proof necessary to support a fraud claim.

Finally, Defendant seeks summary judgment on Plaintiff's prayer for punitive damages. In Oklahoma, punitive damages are available "[w]here the jury finds by clear and convincing evidence" that an insurer has recklessly, or intentionally and with malice, "disregarded its duty to deal fairly and act in good faith with its insured." Okla. Stat. tit. 23, § 9.1(B), (C). Defendant argues that "there are no facts tending to establish the required degree of malice, much less intent, by Standard Life to cause any injury to Plaintiff or Mr. Vinson. There is simply no evidence or testimony in support of any evil intent or substantially equivalent behavior by Standard Life." (Doc. No. 29, p. 29). Plaintiff responds by correctly noting that a prayer for punitive damages is not a claim and therefore, she argues, summary judgment on the issue is inappropriate. Plaintiff does not, however, address whether the evidence establishes that Defendant is subject to liability for punitive damages.

Although punitive damages do not constitute a separate claim, the Court "has a 'responsibility to determine whether any competent evidence exists which would warrant submission of the question of punitive damages to the jury." *Loyd v. Salazar, et al.*, No.

CIV-17-977-D, 2020 WL 7220790, at *4 (W.D. Okla. Dec. 7, 2020)(internal quotation marks and citation omitted). Instruction 5.6 of the Oklahoma Uniform Jury Instructions, which provides the standard for reckless disregard, states:

> The conduct of [Defendant] was in reckless disregard of another's rights if [Defendant] was either aware, or did not care, that there was a substantial and unnecessary risk that [his/her/its] conduct would cause serious injury to others. In order for the conduct to be in reckless disregard of another's rights, it must have been unreasonable under the circumstances, and also there must have been a high probability that the conduct would cause serious harm to another person.

OUJI-Civ. No. 5.6. Accordingly, to avoid summary judgment, Plaintiff must present evidence from which a reasonable jury could find it highly probable that defendant Standard was either aware or did not care that there was a substantial and unnecessary risk that its conduct would cause serious injury. *Hellard v. Mid Century Ins. Co.*, No. 19-CV-00043-GKF-CDL, 2020 WL 6587658, at *7 (N.D. Okla. Nov. 10, 2020). The Court finds that the evidence fails in this regard in light of the clear and convincing standard.

For the reasons set forth herein, Defendant's Motion for Summary Judgment is DENIED as to Plaintiff's breach of contract and bad faith claims but GRANTED as to Plaintiff's fraud claim. Furthermore, the Court declines to permit the jury to consider the issue of punitive damages and GRANTS Defendant's motion in that regard.

**IT IS SO ORDERED** this 7th day of December 2021.

*[signature: David L. Russell]*

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE